Sandra A. SMITH, individually and as the natural mother and legal custodian of Marc W. Brown, a minor child deceased, Cory W. Brock, a minor child deceased, and Benjamin R. Brock, a minor child deceased, and as legal guardian and natural mother of Jeramie D. Watkins, a minor child; Patti S. Gasper and Kenneth Gasper, individually and as the natural parents and legal custodians of Nick J. Gasper, a minor child, deceased, and as legal custodians and natural parents of Luke D. Gasper, minor child, Plaintiffs,

v.

FORD MOTOR COMPANY, Defendant.

Civ. No. 1:93CV0143.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Oct. 24, 1995.

Sherrill W. Colvin, Cynthia Rockwell, John O. Feighner, Haller and Colvin, Fort Wayne, IN, Daniel J. Sigler, Zwick and Sigler, Decatur, IN, for Sandra A. Smith.

W. Scott Montross, Townsend Hovde and Montross, Indianapolis, IN, for Patti S. Gasper, Kenneth Gasper.

Mark A. Garvin, Richard E. Steinbronn, Barnes and Thornburg, Fort Wayne, IN, Kathleen M. Anderson, Barnes and Thornburg, Fort Wayne, IN, Donald H. Dawson, Jr., Kathleen A. Clark, Plunkett and Cooney, Detroit, MI, for Ford Motor Company.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, District Judge.

On September 7, 1995, this Court entered an Order which, *inter alia,* denied defendant Ford Motor Company's Motion for Summary Judgment.[1]  Taking issue with that decision, Ford filed "Defendant's Motion For Certification Of Interlocutory Decision Pursuant To 28 U.S.C. § 1292(b) Or, In The Alternative, To Reconsider Defendant's Motion For Summary Judgment And/Or To Clarify The Court's Decision of September 8, 1995" on September 14, 1995.  Plaintiffs responded to that motion on September 19, 1995 to which defendant replied on September 28, 1995.  For the reasons set forth below, the Motion for Certification of Interlocutory Decision will be denied.  The motion to Reconsider Defendant's Motion for Summary Judgment will likewise be denied.  To the extent that defendant is of the view that this Court's prior ruling on its motion for summary judgment was either obtuse or cryptic, this Memorandum of Decision and Order will serve to clarify that earlier decision.

### Discussion

For present purposes, the facts underlying this litigation may be summarized briefly.  These facts will be expanded upon later as necessary.

On March 20, 1993, a 1985 Ford F–150 XLT caught fire the result of which proved horrific: four children were burned to death.  Immediately prior to the fire, plaintiff Patti Gasper was driving the extended cab pickup truck along Interstate 69.  Along with Gasper, the cab was occupied by plaintiff Sandy Smith and teenagers Jeramie Watkins and Luke Gasper.  In the bed of the vehicle (which was covered by an after-market camper shell) were Smith's three youngest, Ben, Cory and Marc, and Gasper's son Nick.

Around mile marker 32 in Delaware County, Indiana, Gasper's attention was caught by a passing motorist.  Looking back, Gasper saw flames and pulled to the median.  As

---

1. Apart from denying the motion for summary judgment, this Court also denied Ford's Motion for Separate Trial and denied in part and granted in part Ford's motion to strike.

Gasper and Smith exited the cab, the vehicle erupted, killing the four children who were in the bed of the truck.

As a result of the foregoing events, plaintiffs filed this products liability suit against Ford Motor Company. After thorough discovery, Ford moved for summary judgment being of the view that plaintiffs had failed to sufficiently establish that there was a defect in the F–150 XLT attributable to Ford so as to present the question to the jury. This Court disagreed and denied the motion leading to the present motion to reconsider or alternatively for leave to take an interlocutory appeal.

Ford's motions are interrelated and advance three separate arguments. First, Ford argues that this Court's Order erroneously places upon Ford the burden of proving that the admitted possible causes of the fire not attributable to Ford are likely or reasonably possible. Second, Ford claims that after concluding that the affidavit of Franklin did not establish Franklin's expertise in the area of automotive design of fuel systems, the court erred by accepting opinions from Franklin that clearly require such expertise. Third, and finally, Ford asserts that in admitting the Ford documents offered by plaintiffs, the court erroneously equated authentication with admissibility. Each of those arguments will be considered in turn.[2]

### I. Motion To Reconsider

#### A. This Court's Order Did Not Improperly Place on Ford The Burden of Disproving Plaintiffs' Product Liability Claim Nor Did This Court Ignore Controlling Law

■ At the core of Ford's motions is its contention that this Court "erroneously place[d] upon Ford the burden of proving that the admitted possible causes of the fire not attributable to Ford are likely or reasonably probable." (Def.Br. p. 3). This Court disagrees with that argument.

In the September 8, 1995 decision, this Court thoroughly overviewed the standards governing a motion for summary judgment writing, in part:

> In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson*, [*v. Liberty Lobby, Inc.*], 477 U.S. [242] at 249–51, 106 S.Ct. [2505] at 2511 [91 L.Ed.2d 202 (1986)].... Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S.Ct. at 2510.... To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, [*Electric Industrial Co. v. Zenith Radio Corp.*], 475 U.S. [574] at 586, 106 S.Ct. [1348] at 1356 [89 L.Ed.2d 538 (1986)]; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir.1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512. If doubts remain, however, as to the existence of a material fact, then those doubts should be resolved in favor of the nonmoving party and summary judgment denied. *Wolf v. City of Fitchburg*, 870 F.2d 1327, 1330 (7th Cir.1989).

(Rec. 105, pp. 9–10). Since this is a diversity action, this Court then turned to Indiana substantive law for guidance in determining whether plaintiffs had forwarded sufficient evidence of a possible defect in the Ford F–150 to warrant submission of the case to a jury. Further, this Court turned for guid-

---

**2.** Because defendant's motions are interrelated and the arguments advanced with respect to each are the same, this Court will address all of the arguments under the heading "Motion to Reconsider" and, where necessary, further discuss the arguments under the heading "Motion for Leave to File Interlocutory Appeal."

ance to cases from outside this jurisdiction which had similar factual patterns where, as here, the product in question was virtually destroyed. In doing so, however, this Court did not impose upon Ford the burden of proving that the admitted possible causes of the fire not attributable to Ford are likely or reasonably probable.

As the parties to this litigation recognize, and this Court pointed out in the September 8, 1995 decision, "the Gasper truck was substantially damaged by the fire; the entire fuel system was destroyed." (Rec. 105, p. 14). Because of that plaintiffs were forced to rely on circumstantial evidence to prove their case. Certainly proof of a defect via circumstantial evidence is allowable under Indiana law.

In *SCM Corp. v. Letterer*, 448 N.E.2d 686 (Ind.App.1983), testimony linked a Proctor–Silex toaster-oven manufactured by SCM with a fire that substantially destroyed the Letterer's home. At trial, an engineer testified that his examination of the debris in the house and the burn patterns revealed that the fire originated in the kitchen counter next to the refrigerator where the toaster-oven had been located. That testimony contradicted a fire department witness who testified that the fire originated behind the stove.

On appeal to the Indiana Court of Appeals, SCM argued that judgment on the evidence should have been granted because there was no evidence in the record to show that the original toaster-oven[3] was defective and the engineer could not testify to a specific malfunction in the toaster-oven. While testifying that he could discover no one specific cause for the fire, "he did *not* testify there was no defect." *Id.* at 691. Part-and-parcel of the problem the engineer encountered in determining the precise cause of the defect was that the toaster-oven was burned in the fire.

Recognizing products can be destroyed in a products liability case, the Indiana Court of Appeals noted "direct evidence is not required if there is evidence from which a reasonable inference can be drawn as to a

defect proximately causing the injury." 448 N.E.2d 686, 691 (Ind.App.1983) (quoting *Senco Products, Inc. v. Riley*, 434 N.E.2d 561, 568, n. 11 (Ind.App.1982)). The court further wrote:

> The courts would obviously prefer, even in a strict liability case, to have proof of a specific defect causing the harm. But this is not always possible, especially in cases where the product has been destroyed due to its malfunction.

> Most often the failure to produce the product will have a bearing only on the reliability of the circumstantial evidence of causation. If there is sufficient other evidence that harm was caused by some unspecified defect and no other cause likely, the plaintiff ordinarily has made a submissible cause.

*SCM*, 448 N.E.2d at 691 (quoting 1 Frumer & Friedman, Products Liability § 11.01[3][A], 217) (emphasis added).

The notion that a plaintiff may use circumstantial evidence to prove a defect in an Indiana products liability case was recently reaffirmed by the United States Court of Appeals for the Seventh Circuit in *Whitted v. General Motors Corp.*, 58 F.3d 1200 (7th Cir.1995). There the Court wrote: "[w]e find that under the Indiana Strict Product Liability Act a plaintiff may use circumstantial evidence to establish that a manufacturing defect existed only when the *plaintiff produces evidence by way of expert testimony, by way of negating other reasonable causes, or by way of some combination of the two.*" *Id.* at 1209 (emphasis added).

In the present matter, plaintiff produced expert testimony which would suggest that the fire which consumed the Ford XLT–150 was caused by a defect attributable to Ford. In fact, plaintiff produced evidence which would tend to suggest that the fire was caused by any one of a number of defects attributable to Ford. The testimony on this score was based in part on the vehicle fire facts which the experts used in reaching their ultimate conclusions. After review of

---

**3.** The engineer conducted a test on a similar Proctor–Silex toaster-oven producing a situation

where the heating element energized for a period, shut-off, and then re-lighted.

the vehicle fire facts, this Court will turn to those opinions.

Construing the evidence in plaintiffs' favor and allowing them the appropriate inferences, the following may fairly be said to be the vehicle fire facts: The Ford F–150 XLT in question was an extended cab pickup truck equipped with dual gasoline tanks. The mid-ship tank had a fuel capacity of 16.5 gallons while the rear tank could hold up to 19 gallons. The truck was powered by a 5.0 liter V–8 engine. The fuel system was carbureted with an engine-mounted fuel pump.

On the evening before the fateful trip, the truck was tuned up by Michael Binkherd, an auto and truck mechanic and a co-worker of Ken Gasper (Patti's husband). During the course of the tune up, Binkherd changed the oil, installed new spark plugs, distributor cap and air filter; cleaned the PCV valve and rotor; replaced the fuel filter and a belt; and checked all fluids. Binkherd heard no unusual muffler exhaust sounds when he was performing the work.

The following day, as Patti drove southbound on I–69, she set the cruise control at 70 miles per hour. At that time the truck was running smoothly with the fuel coming from the mid-ship tank. Near mile marker 34, her son Luke observed that the gas gauge was low. Patti switched to the rear tank and, immediately upon doing so, heard a loud pop or click similar to the sound a car makes as it runs over a can. A look in the mirror revealed nothing on the road.

At that point, the truck started "bogging down" and the cruise control would not hold at 70 miles an hour. Patti tried to accelerate to no avail. It was apparently at this point that a fellow motorist motioned to her and Patti saw the flames between the cab and truck cap.[4]

Thereupon, Patti turned off the ignition and ran to the back of the truck. The only flames she observed were between the cab and the bed. By the time she got to the rear of the truck, flames came up and covered the windows and cap.

Based upon the fire fact pattern and their knowledge and experiences, several individuals have opined as experts as to the possible causes of the fire. Those opinions pin the blame on a defect in the product which Ford built.

James Grinolds, an expert[5] retained by the plaintiffs, testified as to the origin and cause of the fire during his deposition. He opined:

1. That the origin of the fire was under the bed of the vehicle in the area of the mid-ship fuel tank.

2. That the fire in the Ford F–150 was caused by one of the following three possibilities:

a. A short circuit in the wiring harness in the left frame rail of the F–150 which caused a breach in the nylon 12 fuel line (also located in the left frame rail) and ignited the fuel;

b. A short circuit in the wiring harness in the left frame rail caused by a gasoline leak from a selector valve, o-ring, or crack in the fuel line, which then breaches the nylon 12 fuel line and ignites the fuel; or

c. Heat from the exhaust system breached the nylon 12 fuel line and ignited the fuel.

(Grinolds Dep. pp. 109, 123, 158).

In response to the motion for summary judgment filed by Ford, plaintiffs proffered an affidavit from Frederick F. Franklin, a registered professional engineer.[6] Franklin states that he examined the Ford truck that

---

4. Like Patti, her passenger Smith saw no smoke in the cab of the vehicle.

5. This Court, after conducting a *Daubert* hearing under Rule 104(a) of the Federal Rules of Evidence, concluded that Grinolds could testify as to the origin and cause of the fire but could not testify as to the adequacy of the design of the Ford F–150. *Smith v. Ford Motor Co.,* 882 F.Supp. 770 (N.D.Ind.1995).

6. In his affidavit, Franklin indicates that he operates PACE, Inc., a professional analytical and consulting engineering firm in Cincinnati, Ohio. He further indicates that he has testified as an expert in over 68 trials and has examined over 300 vehicles involved in fires. (Franklin Aff. ¶ 3).

is the subject of this litigation, and he further reviewed the factual descriptions of the vehicle fire as told by surviving victims and eye-witnesses to the case, as well as agency reports and photographs of the vehicle and its component parts. (Franklin Aff. ¶¶ 4–5.) Franklin also indicates that he has previously examined Ford F–Series pickup trucks involved in fires. (Franklin Aff. ¶ 6.) In paragraph 7 of his affidavit, Franklin proceeds to explain his ultimate conclusion that the Gasper vehicle was defective:

a) The Gasper vehicle burned as the result of an extensive fuel fed fire occurring under the bed of the truck.

b) The fire was caused when leaking fuel under the pickup bed was ignited by a heat source.

c) The reasonably probable causes for ignition of fuel under the 1985 Ford F–150 would be exhaust system or under-body heat or electrical short circuit.

d) The fire reached the level of intensity in the speed and manner in which it did due to Ford's use of non-metallic fuel components and the routing and positioning of Ford fuel system components.

e) Existing design technology in 1983 and 1985 provided alternative fuel system components and routing/shielding methods which would have reduced the speed and manner in which this non-collision vehicle fire occurred and spread.

f) [7]

g) Given the facts of this case and the specific vehicle model involved, it is the further opinion of the undersigned that the Gasper fire would not have occurred or progressed in the speed and manner in which it did but for a defective condition in the vehicle.

(Franklin Aff. ¶ 7.)

Still another expert has offered his opinion as to the cause of the fire which destroyed the Gasper's Ford F–150 XLT. John Marcosky, a former design engineer for General Motors, examined the Gasper vehicle, consulted the depositions and Ford discovery information, and testified as to the vehicle fire cause and origin. He was of the view that the burn patterns underneath and about the vehicle indicate that the origin of the fire occurred in the area near the mid-ship tank and selector valve. Marcosky described the progression of the fire from the source of the ignition back to the source of the fuel origin and the area of the fuel selector valve. "Upon consumption of the fuel selector valve and compromising of the fuel lines, which are made of nylon, then you have this lit-fuse affect, which will essentially go in three directions." [8] (Marcosky Dep, p. 136). Marcosky was of the opinion that the cause of the fire was "a fuel leak from the fuel selector valve which was subsequently ignited," (id. at 143) with the ignition source most likely being sparks from the tail pipe of the vehicle. A possible contributing factor to the fuel fed fire was an internal heating of the solenoid core which caused separation of the plastic valve assembly from the solenoid assembly. (Id. at pp. 89–91).[9]

From the foregoing, and drawing the inferences in favor of the plaintiffs, there is evidence from which a jury might reasonably conclude the probable cause of the mid-ship fuel based fire was because of one of three possibilities.[10] First, there was an electrical

7. Paragraph 7(f) of Franklin's affidavit was stricken by this Court in the September 8, 1995 Order because there was insufficient evidence from which to conclude that he had expertise to testify as an expert regarding design.

8. The first direction is toward the front of the vehicle. The second direction is rearward to the rear mounted fuel tank and the third path is toward the discharge unit on the side-mounted fuel tank. (Id.)

9. Marcosky also testified during his deposition as to design defects. In this regard, he opined that

the Nylon–12 fuel lines, while easy to route and comparatively inexpensive, degenerate quicker than steel resulting in fires and the rapid deployment of fuel. (Id. at 219–220). He also was of the opinion that while Ford could have retained dual fuel tanks, it could have eliminated the fuel selector valve since the technology was available for the use of in-tank fuel pumps which could be selected electronically. (Id.)

10. This might be viewed differently as a probability based upon three possibilities. Of all of the myriad of things which could have caused a fire,

short circuit which ignited fuel (either because the nylon fuel line was breached or because there was a gasoline leak which ignited and in turn breached the fuel line). Second, the heat from the exhaust system ignited fuel. Or, third, there was a fuel leak from the fuel selector valve which subsequently ignited.

To be sure, as Ford has pointed out in its most recent brief and earlier briefs, there are other "possible" causes which are not attributable to Ford and which may have caused the fire. On this score, Ford points to the testimony of Grinolds who indicated that it was possible that the fuel line had separated; that it was possible that the fire may have occurred due to "sour gas;" and that it was possible that the fuel line may have been corroded due to road salt. Another possible explanation for the fire is that the fuel line was leaking from an unknown source.

Ford's assertion that these other "possible" causes requires the entry of summary judgment in its favor, however, goes too far. Ford has provided this Court with no evidence that the fuel line had separated, that there was "sour gas" on board the F–150 at the time of the fire, that the fuel line had corroded due to road salt, or that the fuel line was leaking from an unknown source. All Ford has presented on this score is testimony by plaintiffs' experts that these things are "possible." The fact still remains, however, that those experts are of the view that the probable reasons for the fire are among the three possible causes referred to above.

Ford's position appears to be that plaintiff must disprove *any* possible cause of the fire, no matter how speculative, remote, or unsupported by the record. That simply is not the case. "The plaintiff in a products liability suit is not required to exclude every possibility, however fantastic or remote, that the defect which led to the accident was caused by someone other than the defendants." *Welge v. Planters Lifesavers Co.,* 17 F.3d

209, 211 (7th Cir.1994) (applying Illinois law); *Henderson v. W.C. Haas Realty Management,* 561 S.W.2d 382, 386 (Mo.App.1977) ("it is not required that the evidence exclude all possibility of another origin or that it be undisputed; it is sufficient if all the facts and circumstances in evidence fairly warrant the conclusion that the fire did not originate from some other cause"). If plaintiff were required to disprove every possible eventuality, virtually no products liability action could ever survive summary judgment. All defendant's counsel would have to do to thwart the effort would be to speculate on other "possible" causes.[11]

The foregoing does not mean, however, as Ford vigorously asserts in its brief, that this Court is "plac[ing] on Ford the burden of proving that the admitted possible causes of the fire not attributable to Ford are likely or reasonably probable." (Ford Br. p. 3) To the contrary, the burden is upon the plaintiffs' to prove by a preponderance of the evidence that the pickup truck in question was in an unreasonably defective condition. At this stage, plaintiffs are entitled to reasonable inferences in their favor. The reasonable inference to be drawn from the evidence (particularly given the dearth of evidence to support the proposition that a non-Ford cause was the cause of the fire) is that the probable cause of the fire was one of the three possible causes identified by Marcosky, Franklin and Grinolds.

This record before this Court presents a quintessential jury question. Plaintiffs have presented evidence which suggests that the probable cause of the fire was based upon any of three possibilities. True, none of plaintiffs' experts can state beyond peradventure of doubt that this caused the fire or that caused the fire. But that sort of testimony is not necessary to get the case to a jury. "Assuming the subject matter is one which is appropriate for expert testimony and that a proper foundation has been laid, the expert's

these three possible reasons, in the experts' views, are the most probable.

**11.** This could lead to absurd results for the more the product was destroyed in the accident, the greater the chance defendant could point to other "possible" causes. This could prove particu-

larly troublesome in cases such as this because "a fire naturally tends to burn out its own tracks and thus there will be some speculation by an expert testifying as to the anatomy and cause of a fire." *Georgia Power Co. v. Hinson,* 179 Ga.App. 263, 346 S.E.2d 73, 76 (1986).

opinion or conclusion that, in the context of the facts before the witness, a particular proposition is 'possible,' 'could have been,' 'probable,' or 'reasonably certain,' all serve to assist the finder of fact in intelligently resolving the material factual questions." *Noblesville Casting Div. of TRW v. Prince*, 438 N.E.2d 722, 731 (Ind.1982). "The degree of certainty in which an opinion or conclusion is expressed concerns the weight to be accorded the testimony, which is a matter for the jury to resolve." *Id.*

Apart from claiming that this Court unfairly placed the burden on Ford to prove that a non-Ford cause led to the fire, Ford also argues that this Court extensively relied upon authorities which were not applying Indiana law yet "fail[ed] to mention the case of *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898 (7th Cir.1994) ... which is arguably the most recent, controlling statement of the pertinent law from the Seventh Circuit." (Def.Br. p. 16). A review of that case, however, lends more support to the notion that plaintiffs' case is properly resolvable by a jury.

In *Bammerlin*, plaintiff was at the wheel of a tractor-trailer when he struck the right corner of another truck. He was ejected from the cab and received serious injuries. There were three possible explanations for the injuries: he was not wearing a seat belt; he was wearing a belt but was crushed in the cab by the load he was hauling; or he was belted, escaped injury in the cab but was injured when he hit the ground.

In response to an argument relating to causation advanced by the defendant Navistar, the Seventh Circuit wrote:

> Bammerlin need not prove causation directly. He did not have high-speed cameras running in the cab at the time of the accident, and nothing else could have caught a flying object in the act. Instead he proceeded by eliminating the alternatives. We know that he wound up outside the cab. How did he get there? Navistar's theory is that he was not wearing a seat belt. Bammerlin countered this with his say so, plus a physician's testimony that some of his injuries are more consistent with wearing a belt than with the hypothesis that he was not wearing one. ('Seat belt burn' the physician called it). A

biomechanics expert added that the injuries are most consistent with Bammerlin's being belted for part of the time during the crash. This is enough to permit a rational jury ... to find that the belt disengaged during the crash. Engineers trying to understand a disaster often follow causal chains ('failure trees') until they find one that can account for the calamity. Sherlock Holmes observed that 'when you have eliminated the impossible, whatever remains, however improbable, must be the truth.' ... Courts need not disdain a method that both engineers and detectives find useful.

> Bammerlin produced evidence that could lead a rational jury to eliminate the hypothesis inconsistent with his favored theory, which in turn permits an inference that his hypothesis is true.

*Id.* at 902 (citations omitted).

Here, as more fully discussed previously, Marcosky described the progression of the fire based upon the facts described by the witnesses and the physical evidence of vehicle damage. He described the fire spreading from the selector valve area, and the wicking effect of the Nylon–12 fuel line to the tanks. This in turn fed the fire which consumed the Ford XLT F–150. Franklin too offered a causal chain analysis. The upshot of the expert opinions offered by plaintiffs is that the plastic fuel line was vulnerable to siphoning and degradation making the Gasper Ford unreasonably dangerous and defective because of the potential for this type of calamity to occur.

In sum, plaintiffs have offered more than enough evidence of a defect to get this matter to a jury. It will be for them to determine the weight to be given the various expert's testimony. It will be for them to determine credibility. It will be for them to determine whether a defect existed in the Ford making it unreasonably dangerous to a user or consumer.

**B. This Court Did Not Erroneously Consider Paragraphs 7(e) And 7(g) of Franklin's Affidavit Nor Did It Erroneously Consider Documents Produced By Ford**

■ Apart from the foregoing substantive aspects of this case, defendant also takes

issue with certain evidentiary rulings this Court made in considering Ford's Motion for Summary Judgment. On this score, defendant argues that this Court erroneously considered paragraphs 7(e) & (g) of Franklin's affidavit and erroneously considered plaintiff's exhibits G & I which were documents produced by Ford during discovery.

With respect to the Franklin affidavit, Ford asserts that since this Court struck paragraph 7(f) due to an insufficient record relating to Franklin's expertise regarding design, this Court should also have stricken the preceding and succeeding paragraphs. Those paragraphs, 7(e) and (g), stated:

e) Existing design technology in 1983 and 1985 provided alternative fuel system components and routing/shielding methods which would have reduced the speed and manner in which this non-collision vehicle fire occurred and spread.

\* \* \* \* \* \*

g) Given the facts of this case and the specific vehicle model involved, it is the further opinion of the undersigned that the Gasper fire would not have occurred or progressed in the speed and manner in which it did but for a defective condition in the vehicle.

Because this Court acknowledged that it did not have enough information from the affidavit to prove Franklin was qualified to testify as a design expert under the ruling in *Daubert*, Ford argues that Franklin's reports about existing design technology contained in paragraphs 7(e) & (g) are the equivalent of expert opinion testimony about a design defect. That is simply not so.

Paragraphs 7(e) & (g) are reports of facts based upon Franklin's experience in examining vehicles as to what the existing design technology was. Obviously, the utilization of routing and shielding methods and alternative fuel system components could have reduced the speed and manner in which this vehicle fire occurred and spread. Franklin's

opinion directly addresses the fire cause and origin, all within Franklin's expertise.

Arguably, paragraph 7(g) presents a much closer question if one equates the term "defective condition" with the term "defective design" because this Court is of the view that Franklin presented insufficient evidence to support his testifying about design defects. However, even had this Court chosen to strike that paragraph, and hence not consider it for purposes of deciding Ford's motion for summary judgment, the outcome would be the same since, as made clear above, the record is replete with evidence suggesting a probable cause for the fire attributable to Ford.

■ Ford also asserts that this Court erred in considering certain Ford documents which plaintiff attached as exhibits to their response to the motion for summary judgment. On this score, Ford argues that "[t]he Court's Order notes that Ford argued that the documents constitute inadmissible hearsay (Order, p. 7) but the Court did not address the hearsay argument. Instead, the Court ruled that any document produced by Ford is authenticated and thus admissible, apparently for any purpose." [12] Insofar as Ford is still maintaining that the documents in question are hearsay, this Court is of the view that the same are admissible.

Rule 803(6) of the Federal Rules of Evidence provides an exception to the hearsay rule for business records:

A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method of circumstances of preparation indicate a lack of trustworthiness.

---

**12.** It should be noted that the reason the Court did not address the hearsay objection is because the briefs filed by Ford suggested only that the

documents had not been properly authenticated. Accordingly, this Court focused on the authentication issue.

Fed.R.Evid. 803(6). Rule 801(d)(2) allows for the admission of a party opponent if:

> The statement is offered against a party and is (A) the party's own statement in either an individual or a representative capacity or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship.

F.R.Evid. 801(d)(2).

In the present matter, Ford has not claimed that the documents in question were not produced from its business record, nor does it contend that the documents were not generated by Ford employees in the normal course of business. As such, the Ford documents are admissible either as admissions of a party opponent or as a business record.

■ While not disputing the accuracy of the records or their origin, Ford, in its most recent brief, suggests that plaintiffs have failed to show that the same are relevant. It would appear, however, that the relevancy of the documents in question are apparent on their face.

Plaintiffs' exhibit G is a SAE Technical Paper entitled "Design Considerations for Plastic Fuel Lines" authored by "M.J. Harrigan Ford Motor Co." Plaintiffs' Exhibit I is a copy of the "Potential Campaign Prevention Report" forwarded by P.R. Beuckelaere of Ford's "Fuel System and Powertrain Isolation Department." [13] Presumably, part of Ford's business is investigating and analyzing consumer complaints and other product failures in an effort to reduce the possibility

of reoccurrence. The foregoing documents appear to be related to such activity. As such, they may constitute probative evidence of defendant's knowledge of the danger of its product. "Evidence of other accidents in products liability cases is relevant to show notice to the defendant of the danger, to show existence of the danger, and to show the cause of the accident." *Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1268 (7th Cir.1988).[14]

By way of summary, this Court is of the view that plaintiffs have adequately carried their burden of establishing a material issue of fact regarding the cause of the fateful March 20, 1993 fire. That being the case, defendant's motion for summary judgment was appropriately denied and accordingly, the motion to reconsider that ruling is denied.

## II. Motion For Leave To File Interlocutory Appeal

■ Title 28, United States Code, Section 1292(b) provides in relevant part the following:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order.

28 U.S.C. § 1292(b). Thus, this Court must consider three factors when considering a motion for certification: (1) whether the motion to be appealed involves a controlling question of law; [15] (2) whether there is a

---

**13.** Arguably, a portion of plaintiffs' exhibit I consisting of some six pages of handwritten scrawlings, may or may not be admissible. It is important to note for present purposes, however, that these handwritten notes have no bearing on this Court's conclusion that summary judgment would be inappropriate and that even without these handwritten items, and all of the Ford documents contained in exhibits G & I, the entry of summary judgment would still be inappropriate.

**14.** Before such evidence would be admitted at trial, however, "the proponent must show that the other accidents occurred under *substantially similar circumstances*." *Id.* Again, as indicated in footnote 13, *supra*, the Ford documents were not necessary to this Court's conclusion that Ford was not entitled to summary judgment since plaintiffs' experts provided sufficient evidence to withstand that motion.

**15.** As to the first of the three factors, the Seventh Circuit has adopted a flexible interpretation of what a "controlling question of law" is for pur-

substantial ground for difference of opinion on that question of law [16]; and (3) whether an immediate appeal from the order may materially advance the ultimate termination of the litigation.

The decision of whether to grant an interlocutory appeal is discretionary. The party moving for the § 1292(b) interlocutory appeal bears the burden of persuading the court that exceptional circumstances justify departing from the normal course of taking an appeal after entry of final judgment. *Wright v. Kosciusko Medical Clinic, Inc.,* 791 F.Supp. 1327, 1334 (N.D.Ind.1992) (citing *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 475, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1978). Permission to take an interlocutory appeal should be granted sparingly and with discrimination. *Resolution Trust Corp. v. Gallagher,* 1992 WL 315218, 1992 LEXIS 16226 (N.D.Ill. Oct. 23, 1992) (quoting *In re Folding Carton Antitrust Litigation,* 75 F.R.D. 727, 738 (N.D.Ill.1977).)

In its motion for certification of the September 7, 1995 Order, Ford contends:

1. The Court misapplied the holding of *SCM Corp. v. Letterer* 448 N.E.2d 686 (Ind.App.1983) and, as a consequence, erroneously placed upon Ford the burden of disproving Plaintiffs' claims. For Plaintiffs' claims of a 'possible' defect to survive summary judgment, *SCM* requires that there be evidence that "no other cause [(not attributable to Ford) is] likely." *SCM,* 448 N.E.2d at 691. The Court erroneously concluded that a failure of evidence tending to prove that other causes *are* likely is equivalent to affirmative evidence tending to prove that the other causes are not likely.

2. Having determined that Frederick Franklin was not shown to possess expertise in the area of automotive or fuel system design, the Court erred in accepting as evidence his opinion concerning alternative fuel system design and his opinion that the fire progressed in the means in which it did due to a design defect.

3. The Court admitted the documents produced by Ford during discovery based solely upon the fact that the documents were produced by Ford during discovery. The act of production authenticated the documents, but did not otherwise render them admissible.

(Def.Br. p. 2). All of those arguments were addressed in the preceding section of this decision and have been found by the Court to be without merit.

Because this Court did not place the burden on Ford of disproving plaintiffs' product liability claims, Ford has not presented this Court with a legal issue involving "a controlling question of law as to which there is substantial ground for difference of opinion." This Court merely found that, given the appropriate inferences, plaintiffs produced sufficient evidence to enable a jury to decide the fact-sensitive issue in this litigation. This Court did nothing to alter the respective burdens imposed under Rule 56 on plaintiffs and Ford.

Nor did this Court err in considering paragraphs (e) and (g) of Franklin's affidavit or the Ford documents. Even without such matters, there is sufficient evidence proffered by plaintiffs to get this case to a jury.

In considering the motion for leave to file an interlocutory appeal, it must be borne in mind that Ford does not argue that Indiana law governing a defect claim in a products liability action is indefinite or that there is a split of authority on the issue. All it really argues is that this Court misapplied that body of law. As indicated previously, this Court disagrees with that assessment and, accordingly, the Court finds that there are no

poses of § 1292. *See Johnson v. Burken,* 930 F.2d 1202, 1206 (7th Cir.1991). The question is considered controlling "even though its decision might not lead to reversal on appeal, if interlocutory reversal might save time for the district court, and time and expense for the litigants." *Id.* at 1206.

16. With respect to the second factor, "the district judge must analyze the strength of the arguments in opposition to the challenged rule in deciding whether the rule for appeal is truly warranted on which there is substantial ground for dispute." *Resolution Trust Corp. v. Gallagher,* 1992 WL 315218 at *5, 1992 LEXIS 16226 at *14 (N.D.Ill. Oct. 23, 1992).

exceptional circumstances warranting the taking of an interlocutory appeal.

### Conclusion

On the basis of the foregoing, defendant Ford Motor Company's motion to "Reconsider Defendant's Motion for Summary Judgment" is DENIED and this Court's September 7, 1995 Memorandum of Decision and Order denying defendant's motion for summary judgment is RECONFIRMED. Defendant's "Motion for Certification of Interlocutory Decision Pursuant to 28 U.S.C. § 1292(b)" is likewise DENIED.